152

Hurlburt *v.* Fidelity Window Cleaning Company et al., Appellants.

Argued March 25, 1960. Before GUNTHER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONTGOMERY, JJ. (RHODES, P. J., absent).

 reargument refused May 14, 1960.

*Frank R. Ambler,* for appellants.

*Maurice Freedman,* with him *Robert H. Arronson,* and *Herbert H. Hadra,* for appellee.

OPINION BY WRIGHT, J., April 13, 1960:

This is a workmen's compensation case. The employer has appealed from a judgment in favor of the employe, entered by the court below after it had reversed a decision of the Workmen's Compensation Board which had dismissed the claim petition. It will be necessary to set forth the factual and procedural situation in some detail.

Walter Hurlburt, now 62 years of age, was an employe of the Fidelity Window Cleaning Company. His job was to remove paint and putty from, and wash the glass in, the windows of newly constructed buildings. Although our first concern is with an accident on January 26, 1953, Hurlburt's medical history for some time prior to that date was rather extensive. On April 21, 1951, he fell astride a carpenter's horse, injuring one of his testicles. As a result he underwent a hydrocelectomy at St. Luke's Hospital. On July 18, 1951 he was treated for a papillitis. On August 13, 1951, he was treated for a sacroiliac strain. On January 17, 1952, he was treated for a fistula. On February 13, 1952, while working in Greensboro, North Carolina, he fell on his lower back and suffered pain in the sacroili-

ac and lumbar region. On June 27, 1952, he was treated for pain in the right lower quadrant. On September 3, 1952, he was treated for recurrent pain in the same area. On October 21, 1952, he was given diathermy treatment for lumbo-sacral pain. On January 21, 1953, he was given diathermy for pain in the lumbo-sacral region.

We now come to January 26, 1953, on which date Hurlburt was working inside a building in Durham, North Carolina. He stepped from a windowsill into a bathtub in which there was a loose curtain roll. He slipped on the curtain roll and fell over the bathtub to the floor. As a result of this accident a compensation agreement was executed describing the nature of the injuries as follows: "sprained back and pulled ligaments in lower stomach region". Compensation was paid by virtue of this agreement until March 9, 1953. Hurlburt thereafter, March 16, 1953, executed a final agreement receipt.

We are next concerned with an incident which allegedly occurred in August, 1954 while Hurlburt was cleaning windows in a building at Pittsburgh. As a result of this alleged incident, Hurlburt filed, December 22, 1954, a petition to set aside the final receipt for the following reason: "my accident was weakening of the right inguinal ligament which in August of 1954 resulted in a right inguinal hernia". In its answer to this petition the employer averred that claimant had fully recovered at the time he executed the final receipt and that his disability, if any, was unrelated to the accident. After two hearings on the petition to set aside the final receipt, May 4, 1955 and July 13, 1955, counsel for Hurlburt filed a claim petition on the theory that a new accident had occurred in August 1954 described as follows: "right inguinal hernia due to strain on ligaments previously weakened in earlier accident of January 26, 1953". To this petition the em-

ployer filed an answer denying that an accident had occurred. At the next hearing, December 7, 1955, it was stipulated that the testimony taken at the prior hearings would be applicable to both petitions. The referee then appointed an expert medical witness who testified at a hearing on April 2, 1958.

On April 29, 1958, the referee filed a decision and order dismissing the petition to set aside the final receipt. There was no appeal from this order. On May 1, 1958, the referee made an award on the claim petition, finding that, on July 28, 1954,[1] there was a new accident described as follows: "claimant sprained his right groin in overextending his right arm in an upward direction while cleaning windows, resulting in a right inguinal hernia, [which] was an aggravation of a weakened condition of the right inguinal ring precipitated by the accident of January 26, 1953". Upon the employer's appeal the board made an order of remand so that there could be placed in the record the testimony taken at the hearing of May 4, 1955. At the remand hearing on December 5, 1958, it was developed that the testimony at the hearing of May 4, 1955 had not been transcribed and could not be supplied. The employer then called the claimant for additional cross-examination. After the remand hearing, the referee filed a second decision in the claimant's favor in which the description of the new accident on July 28, 1954 was identical. Following the employer's appeal, the Workmen's Compensation Board, August 12, 1959, filed an opinion setting aside the referee's finding of fact, and substituting its own. In particular, the board made the following finding: "5. On July 28, 1954, while claimant was performing the work above-mentioned, he was engaged in his normal duties which he had per-

---

[1] According to the testimony of the employer, July 28, 1954 was Hurlburt's last day of work in Pittsburgh.

formed on numerous occasions, and nothing unusual, or untoward occurred". The board concluded that claimant had not sustained a second accident, and therefore dismissed his claim petition.

The applicable legal principles are well-settled. Claimant has the burden to prove all of the elements necessary to support an award: *Witters v. Harrisburg Steel Corp.*, 183 Pa. Superior Ct. 450, 132 A. 2d 762. We must view the evidence in the light most favorable to the party having the board's decision: *Curran v. Knipe & Sons, Inc.*, 185 Pa. Superior Ct. 540, 138 A. 2d 251. Where the board has made a determination against the party having the burden of proof, the question before the court on appeal is whether the board's findings of fact are consistent with each other and with its conclusions of law, and can be sustained without a capricious disregard of the competent evidence: *Rodgers v. Methodist Episcopal Hospital,* 188 Pa. Superior Ct. 16, 145 A. 2d 893. In the words of Judge (now President Judge) RHODES in *Mancuso v. Mancuso,* 150 Pa. Superior Ct. 22, 27 A. 2d 779: "Claimant's disability is not compensable unless the result of an accident in the course of his employment . . . The burden was on claimant to show by competent evidence that his disability was accidental and not from natural causes or from the normal progress of his condition . . . It was for the board as the final fact-finding body to determine from all the evidence whether claimant had sustained the burden resting upon him, and its finding that he had not is a pure finding of fact".

On cross-examination claimant testified, inter alia, as follows: "Q. And it was in August of 1954 that you had this second accident? A. That's right; yes, last year. Q. You were cleaning a window? A. Yes, sir. Q. And you reached up to do what? A. I was washing windows. I reached up, reached up. Q. How many windows have you washed in your lifetime? A. Oh, I

have washed a lot of them, about twenty-five years or more. Q. Were you washing this one the same way you washed all the rest of them? A. Well, different ones you have to wash different, you know. They are hard to get to, a lot of them. Q. I say, you washed this the same way you washed the rest of them? A. I guess so ... Q. Then you often got this pain when you washed windows? A. Yes, sir. Q. You got it regularly; it happened every now and then? A. Yes, sir. Q. And you were washing the windows this day just the same and you got the pain again? A. Yes, sir ... Q. Do you have to stretch when you are washing windows? A. In cases, you do, yes. Q. To get up to the top of them or something or what? A. That's right; you do have to stretch. Q. It's a regular part of your work to stretch? A. Yes. We stretch sometimes when we shouldn't stretch, I guess, to try to get a window. Q. But you do do it? A. Yes. Q. And all window cleaners do it? ... A. I imagine they do, yes. Q. Do you stretch every day? A. I guess I do". The claimant admitted that, on or about October 5, 1954, he had made a statement to a representative of the insurance carrier containing the following: "I have had no accident since this fall in 1953, no slips, no falls since that accident. Since the ending of work with Fidelity I went right to work for the Kensington Window Cleaning Company and I am still employed by them".

Coming now to the medical testimony, Dr. Gordon Dorman, claimant's family physician, testified that, following the accident of January 26, 1953, he first saw the claimant on January 28, 1953, and that claimant had suffered bruises of the sacral region and also "a permanent stretching of the right inguinal ligament, and enlargement of the external inguinal opening". Dr. Dorman discharged claimant on February 21, 1953. On or about August 16, 1954, after a number of consultations in the interim, claimant reported to Dr. Dorman

that, while working in Pittsburgh, he had suffered an aggravation of the injury of January 26, 1953, at which time he had "stretched, causing pain in the right inguinal region". At that time Dr. Dorman "found an increase in the size of the external inguinal canal and the probability of an inguinal hernia". On cross-examination Dr. Dorman testified as follows: "Q. Yes. Now, Doctor, in your opinion, he had no signs or symptoms of a hernia up until the episode in Pittsburgh in August of 1953; is that correct? A. No, August of 1954. Q. 1954? A. That's correct, definitely correct. I would not diagnose a hernia up to that time. Q. And he gave you a history that it was due to stretching? A. Well, it would have to be more of an over-stretch. By over-stretching, I mean—Q. That's what I am asking you—in your opinion could stretching or over-stretching cause a hernia? A. In a previously weakened inguinal opening, yes. Q. Doctor, you heard him testify that he had this stretching day in and day out; right? A. Right. Q. In your opinion was it precipitated through one accident or through the accumulations of the over-stretching? A. I don't see how a direct medical answer can be given to that . . . Q. Doctor, you can certainly tell us whether you have an opinion as to whether one stretch did it or whether it was the result of repeated stretches. A. I feel that the last stretching was the precipitating factor . . . Q. In other words, each strain may have weakened it some? A. Possible. Q. And then it just reaches the point where it is going to give on the last stretch? A. Correct. That's possible. Q. And that's what you think happened here? A. I said that was possible. That's one of the possibilities . . . Q. Then, Doctor, these pains that he has testified to that he got at various times while he was working—A. Right. Q.—between 1953 and August of 1954? A. Right. Q. Were they enlarging it further? A. Possible . . . Q. Well now, Doctor, when you first

saw him on August 28, 1954, he didn't have any hernia? A. I saw him on August 16, 1954. Q. On the 16th, he didn't have any hernia, did he? A. (There was no response) Q. Look at your report. A. Nothing that I would call an indication of a true hernia at that time".

Dr. Jay H. Davidson, the impartial medical expert, made one examination of the claimant, October 12, 1957. His testimony may be summarized in the following excerpt from his report: "The pertinent physical findings in this particular case are in the right inguinal area. There was minimal but definite swelling in this area in comparison with the left side. The external inguinal ring was definitely enlarged in comparison with the left side and a definite more marked impulse could be felt within the ring on coughing or straining. It is my impression that this man has a minimal right inguinal hernia which can be probably well controlled by the use of an appliance. He did not have the appliance with him when he was examined by me. It is my opinion that this man had probably some weakness of the anatomical structures in the right inguinal area and that the repeated trauma undoubtedly contributed to the production of what is now the right inguinal hernia". On cross-examination Dr. Davidson testified as follows: "Q. Doctor, is it your opinion that he did have a congenital condition there and this repeated daily stretching in his work, the accumulation of that, caused this hernia? A. Well, as I perhaps suggested in my report, sir, the general concept of a hernia is that there must have been some pre-existing weakness of some sort, and on the basis of this concept it was my opinion that Mr. Hurlburt probably aggravated what was already some degree present; that is to say, it may not have been an actual hernia before these particular sequences of events occurred, but these sequences of events which have been described in the record probably precipitated the presence of this hernia. Q. It

would be an accumulation of those sequences? A. That's right, I think so".

It is our view that the foregoing summary of the record fully justifies the statement in the board's opinion "that the injury sustained by claimant on July 28, 1954, resulted from accumulations of over-reaching in the normal course of his duties as a window washer and did not constitute an accident". We are not persuaded that there was any material inconsistency in the board's findings of fact, or that there was a capricious disregard of competent evidence, nor are we in accord with the position of the court below that the record requires the conclusion that claimant's so-called over-stretching "was not of the kind and quality usual to his employment". Claimant's testimony indicates only that, whether stretching or over-stretching, he was doing his normal work in his normal manner. While claimant may have had a pre-existing weakness in the right inguinal area, the mere aggravation thereof is not compensable unless there is clear proof of an accident in the ordinary lay understanding of that term. Cf. *Turek v. Damalak,* 161 Pa. Superior Ct. 84, 53 A. 2d 748; *Rupchak v. Westinghouse Electric & Manufacturing Co.,* 161 Pa. Superior Ct. 228, 54 A. 2d 309; *Schaefer v. Central News Co.,* 179 Pa. Superior Ct. 559, 118 A. 2d 268; *Landis v. General Motors Corp.,* 180 Pa. Superior Ct. 332, 119 A. 2d 645; *Lorigan v. Gulbranson, Inc.,* 184 Pa. Superior Ct. 251, 132 A. 2d 695.

We have not overlooked claimant's contention that he is entitled to compensation "even if the accident of July 28, 1954 was not of the conventional type". The only case cited in support of this proposition is *Kracoski v. Bernice White Ash Coal Co.,* 183 Pa. Superior Ct. 155, 130 A. 2d 190, which fully sustains our determination of the instant appeal.

Judgment reversed and here entered for the appellants.